**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

                         Plaintiff,

      vs.                CASE NO. 8:21-mj-1396-AEP
                          April 27, 2021
                          Tampa, Florida
                          4:48 - 5:32 p.m.

JAMEL MULDREW,

                    Defendant.
_____/

**TRANSCRIPT OF INITIAL/PRELIMINARY HEARING**
BEFORE THE HONORABLE AMANDA ARNOLD SANSONE
UNITED STATES MAGISTRATE JUDGE

**APPEARANCES:**

For the Government:      FRANCIS MURRAY, ESQ.
                            Assistant U.S. Attorney
                            400 N. Tampa Street, Suite 3200
                            Tampa, Florida 33602
                            813/274-6000

For the Defendant:       ADRIAN BURDEN, ESQ.
                            Assistant Federal Defender
                            400 N. Tampa Street, Suite 2700
                            Tampa, Florida 33602
                            813/228-2715

Court Reporter:          Howard W. Jones, RPR, FCRR
                            801 N. Florida Avenue, Suite 15A
                            Tampa, Florida 33602
                            813/301-5024

Proceedings transcribed via courtroom digital audio
recording by transcriptionist using computer-aided
transcription.

**I N D E X**

                                                          **PAGE**


TESTIMONY OF WILLIAM WILLIGER
   Direct Examination by Mr. Murray:              9
   Cross-Examination by Ms. Burden:              24
   Redirect Examination by Mr. Murray:           30

CERTIFICATE OF COURT REPORTER:                   35


* * * * * * * * *


**E X H I B I T S**

***(NONE ADMITTED INTO EVIDENCE)***


* * * * * * * * * *

## P R O C E E D I N G S

1

2          (Court called to order.)

3          THE COURT:  Okay.  Good afternoon.  We are here on

4     Case No. 21-mj-1396-AEP, United States vs. Jamel Muldrew.

5          Could counsel state their appearances, starting

6     with the government, please.

7          MR. MURRAY:  Good afternoon, Your Honor.  Francis

8     Murray for the United States standing in for AUSA Spergel.

9          THE COURT:  Thank you.

10          MS. BURDEN:  Good afternoon, Your Honor.  Adrian

11     Burden on behalf of Mr. Muldrew, who's seated to my right.

12          THE COURT:  Thank you.

13          And, Mr. Muldrew, you are here because you have

14     been charged with a felony by way of a criminal complaint

15     that's supported by a federal agent's affidavit.

16          Have you had a chance to look over a copy of that

17     complaint?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  And in this proceeding I'll go over

20     the charges with you, I'll advise you of your constitutional

21     rights, and then determine whether you will be released or

22     detained.

23          Do you have any physical or mental condition that

24     would make it difficult for you to participate in this

25     hearing?

4

1              THE DEFENDANT:  No, ma'am.

2              THE COURT:  Have you taken any medication,

3      anything that would make it hard for you to focus and answer

4      my questions?

5              THE DEFENDANT:  No, ma'am.

6              THE COURT:  And you have the right to have an

7      attorney in this case and you may consult with your attorney

8      and be represented at all stages of the proceedings, both

9      when you're in court and when you're out of court.  You do

10     have the right to hire counsel of your own choice and if you

11     cannot afford counsel, then I can appoint counsel to you.

12             I did review your financial affidavit and it does

13     appear that you qualify for Court-appointed counsel.  Would

14     you like for me to appoint counsel for you?

15             THE DEFENDANT:  Yes, ma'am.

16             THE COURT:  And, Ms. Burden, does your office

17     accept the appointment?

18             MS. BURDEN:  Yes, Your Honor.

19             THE COURT:  So, Mr. Muldrew, to be clear,

20     Ms. Burden is here today from the Federal Public Defender's

21     Office, but it is not Ms. Burden specifically that I'm

22     appointing, it's her office.  So you may end up with a

23     different attorney from her office.

24             Do you understand that?

25             THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Have you had a chance to speak to

2    Ms. Burden, though?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Would you like more time to speak with

5    her or are you ready to go forward?

6          THE DEFENDANT:  I'm ready to go forward.

7          THE COURT:  If at any time you need to speak with

8    her during this hearing, that's no problem, you just need to

9    tell me so that we can make sure that you're able to have a

10   confidential conversation in a safe manner.  Okay?

11         THE DEFENDANT:  Okay.  Thank you.

12         THE COURT:  Looking at your criminal complaint,

13   the cover sheet of it, the front page, tells you what the

14   offense descriptions are and it lists three.

15         The first is 18 United States Code, Section

16   1591(a), and that's for sex trafficking of a minor;

17         The second code section is 18 United States Code,

18   Section 2421(a), and that's for the interstate

19   transportation of a person to engage in prostitution or

20   unlawful sexual activity; and,

21         Then the third is 18 United States Code, Section

22   2422(a), and that offense description is enticement of a

23   person to travel interstate for prosecution (sic) or

24   unlawful sexual activity.

25         And the criminal complaint, then the affidavit

1  attached to it goes on and provides in detail events that

2  occurred on April 9th, 2021, and then more specifically with

3  regard to an individual with the initials N.P., who was a

4  17-year-old female. And so it goes through to detail both

5  your involvement with N.P. and then also an interaction that

6  she had and that you then also had with law enforcement

7  related to an operation that -- human trafficking operation

8  being conducted here in Tampa, Florida.

9          Do you understand that these are the charges that

10 have been brought against you?

11         THE DEFENDANT: Yes, ma'am.

12         THE COURT: In connection with these charges, you

13 have the right to remain silent. You are not required to

14 make a statement to anyone and that includes to law

15 enforcement.

16         If you've already made a statement to anyone, you

17 do not need to say anything more. And if you start to make

18 a statement, you may stop yourself at any time.

19         You have the right to speak to your attorney prior

20 to any questioning and you also have the right to have your

21 attorney there with you during any questioning.

22         What you need to understand, Mr. Muldrew, is if

23 you make a statement during questioning, that statement can

24 later be used against you.

25         So do you understand that?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And then also, because this is a

3    criminal complaint, you do have the right to a preliminary

4    hearing.  At that hearing, the government would be required

5    to establish probable cause to believe that you have

6    committed the offenses in the complaint and then Ms. Burden

7    would be entitled to cross-examine any witnesses and

8    introduce any evidence that you have.

9          Ms. Burden, have you discussed the -- his right to

10   a preliminary hearing with him?

11         MS. BURDEN:  Yes, Your Honor, and we would request

12   a preliminary hearing.

13         THE COURT:  And, Mr. Murray, when would you be

14   ready to do the preliminary hearing?

15         MR. MURRAY:  Right now, Your Honor.

16         THE COURT:  Okay.  Then do you need to take a

17   brief recess or are you ready to start immediately?

18         MR. MURRAY:  No, Judge, we're ready.  The United

19   States calls Special Agent Williger with Homeland Security

20   Investigations.

21         THE COURT:  Okay.  He may come --

22         MR. MURRAY:  May he take off his mask or --

23         THE COURT:  So here's what we can do:  Once he is

24   at the witness stand and is distanced enough, then, yes, but

25   just stay either at your table then with the microphone,

1    let's not go back and forth and share the podium if you're

2    taking your mask off.  So it's okay and just use one of the

3    microphones --

4           Well, but, Ms. Burden, if you cross-examine, do

5    you think you'll use the podium?

6           MS. BURDEN:  I may, but I'll leave my mask on,

7    Your Honor.  I'm comfortable speaking with mine on.

8           THE WITNESS:  It's okay, Your Honor, I can leave

9    it on.

10          THE COURT:  Okay.  Either way, it's just that --

11   you're far enough away from Ms. Burden that I'm not

12   concerned with you taking your mask off at the podium and if

13   she's going to keep hers on, then that would be no problem.

14          MR. MURRAY:  Okay.

15          (Witness sworn by the Deputy Clerk.)

16          THE WITNESS:  I do.

17          THE DEPUTY CLERK:  Please have a seat and once you

18   have the microphone, can you please state your name and

19   spell your last name for the record.

20          THE WITNESS:  My name is William Williger.  The

21   last name is W-i-l-l-i-g-e-r.

22          THE COURT:  And if you want to take a minute and

23   connect it to your lapel, you're welcome to.  And then

24   you're also there, if you'd like to take our mask off, you

25   may as well, because we're socially distanced here.

```
 1              THE WITNESS:  Thank you.

 2                      DIRECT EXAMINATION

 3   BY MR. MURRAY:

 4   Q.    Special Agent, are you employed?

 5   A.    Yes, I am.

 6   Q.    And where are you employed?

 7   A.    Homeland Security Investigations, Tampa.

 8   Q.    And how long have you worked there?

 9   A.    Since approximately 2006.

10   Q.    Do you have any experience investigating child

11   exploitation or human trafficking cases?

12   A.    Yes, I do.

13   Q.    And what is that experience and training?

14   A.    From approximately 2008 to approximately 2016, I was

15   assigned to the old Clearwater-Tampa Bay Area Human

16   Trafficking Task Force.  During that time period I

17   investigated numerous sex trafficking and labor trafficking

18   cases.  I traveled internationally and nationally teaching

19   federal, state, local, and foreign law enforcement how to

20   conduct human trafficking investigations.  I assisted with

21   the development of the Federal Law Enforcement Training

22   Center's human trafficking curriculum and I assisted with

23   the development of Homeland Security Investigation's online

24   continuing education human trafficking courses.

25   Q.    And are you familiar with an investigation into an
```

1    individual names Jamel Muldrew?

2    A.   I am.

3    Q.   Did you have any role in that investigation?

4    A.   Just reviewing reports and writing -- assisting with

5    the affidavit.

6    Q.   And so in reviewing those reports, were those reports

7    from other law enforcement officers?

8    A.   Yes, they were.

9    Q.   And have you spoken to other law enforcement officers

10   as well regarding the investigation?

11   A.   I have.

12   Q.   So it's fair to say, then, that your testimony here

13   today is primarily secondhand knowledge, but --

14   A.   Yes.

15   Q.   Directing your attention to April 9th of 2021, was

16   Homeland Security Investigations investigating -- or

17   conducting an operation at that time?

18   A.   Hillsborough County Sheriff's Office was, but they

19   were -- but our Task Force officers were part of that

20   investigation.

21   Q.   Can you describe that investigation generally to the

22   Court?

23   A.   Yes.  Hillsborough County Sheriff's Office was looking

24   for individuals that were posting ads on the internet,

25   specifically on the website known as MegaPersonals and they

1  were looking for individuals that appeared to be under the

2  age of 18 years of -- 18 years old.  They would then contact

3  those individuals and set up what's frequently known as a

4  date in hopes of ascertaining the age of the individual in

5  the advertisement and making contact with the individual

6  that brought them to that date.

7  Q.   And, Special Agent, based on your training and

8  experience, what is MegaPersonals?

9  A.   MegaPersonals is on online forum where individuals post

10 advertisements for the purposes of committing commercial sex

11 acts.

12 Q.   And again, directing your attention to April 9th, 2021,

13 are you aware of any dates that were set on that date?

14 A.   Yes.

15 Q.   Can you walk us through what happened on April 9th of

16 2021?

17 A.   Hillsborough County Sheriff's Office, their Task Force

18 officer with HSI, found an advertisement from a female that

19 appeared to be under the age of 18.  The Task Force officer

20 then sent a text message to that -- to the telephone number

21 that appears on the MegaPersonals ad inquiring if that

22 person was available to have a date.

23 Q.   And did that phone number respond?

24 A.   Yes.

25 Q.   And can you characterize that conversation for the

1   Court?

2   A.   The undercover asked how much it would be for a

3   two-hour date and the response that the undercover received

4   back from that telephone number was something to the effect

5   of $800, baby.  They agreed that for -- the undercover

6   agreed that 800 was a fair price for a two-hour date.

7   Q.   And where was that date to take place based on your

8   understanding of the conversation?

9   A.   At a Marriott in the area of Citrus Park in Tampa,

10  Florida.

11  Q.   Is that in the Middle District of Florida?

12  A.   It is.

13  Q.   Did anyone -- well, let's focus on the Marriott for a

14  second.  Was there law enforcement presence at that

15  Marriott?

16  A.   Yes, there was.

17  Q.   Can you explain to the Court why that is?

18  A.   There's law enforcement presence located both inside

19  and outside.  The law enforcement present outside is for

20  surveillance purposes, to identify anybody that's dropping

21  off a female so they can get a description of the female

22  that hopefully matches the advertisement so the law

23  enforcement offers in the room will know that that

24  individual is on their way.  They're also attempting to

25  identify the individual that's driving the vehicle that's

1    dropping off the -- that female.

2        The law enforcement presence inside the hotel is

3    comprised of an undercover and then more or less a takedown

4    or an arrest team.  So when the commercial sex act has been

5    agreed upon, law enforcement will detain the individual in

6    the room with the undercover.

7    Q.   And so to be clear, Special Agent, this is a sting,

8    correct?

9    A.   Yes, sir.

10   Q.   And was that hotel room shared in the conversation with

11   the phone number that was contacted for MegaPersonals?

12   A.   Yes.

13   Q.   Did anyone end up arriving on April 9th, 2021?

14   A.   Yes.

15   Q.   Who arrived?

16   A.   A female by -- known only to the undercover by the name

17   Mercedes.

18   Q.   Did anyone else arrive with her?

19   A.   Yes, she was dropped off by another male driving a

20   black Chevy Impala.

21   Q.   Is that male in the courtroom here today?

22   A.   Yes, he is.

23   Q.   Could you please point him out and describe him by an

24   article of clothing to the Court?

25   A.   He's the individual sitting at my left in the white

1   T-shirt.

2   Q.   Now, when the female arrived, what happened then?

3   A.   The undercover brought her into the room.  Some

4   smalltalk occurred.  They agreed upon the 800-dollar price.

5   The undercover asked what to do with it, she said, place it

6   on the table.  And she -- the female repeatedly requested

7   that the undercover take off his clothes to prove that he

8   was not law enforcement, at which point the takedown team

9   came in and detained the female.

10  Q.   Now, the team detained the female.  Was the female

11  eventually identified?

12  A.   Yes.

13  Q.   How was the female identified?

14  A.   She was identified as a 17-year-old female from Texas.

15  Q.   But how is her real world identity determined?

16  A.   Oh, I'm -- she eventually she told -- she told law

17  enforcement her real name and told -- and provided them her

18  age.  And then through various -- checking various

19  databases, they were able to determine that she was in fact

20  who she said she was.

21  Q.   And so I take it her real name wasn't Mercedes?

22  A.   No, it was not.

23  Q.   Were her initials N.P.?

24  A.   Yes, they were.

25  Q.   And that's -- as far as law enforcement is aware,

1    that's her real -- those are the initials of her real legal

2    name?

3    A.    Yes.

4    Q.    Do you recall her date of birth or the year of her

5    birth?

6    A.    I do not.

7    Q.    But you said -- how old was she at the time?

8    A.    Seventeen.

9    Q.    Are you aware of anything that happened to the

10   defendant who you testified was accompanying her, at least

11   initially when they arrived?

12   A.    Yes.

13   Q.    What happened after the female entered the hotel room?

14   A.    He departed the Marriott parking lot and drove to the

15   area of the Citrus Park Mall, exited his vehicle and was

16   texting the female -- the under -- the juvenile minor -- the

17   juvenile that was in the room with the undercover.

18   Q.    And what was he texting her just generally?

19   A.    Generally, are you in there, I'm getting nervous,

20   hello.

21   Q.    And then when he went to the mall, did law enforcement

22   eventually make contact with him at any point?

23   A.    Yes, they did.

24   Q.    And could you tell the Court what happened then?

25   A.    Law enforcement approached the defendant, identified

1    themselves.  He attempted to run towards his vehicle and he

2    was taken into custody without further incident.

3    Q.   Was he searched incident to arrest?

4    A.   Yes, he was.

5    Q.   What, if anything, did he have on him that relates to

6    the investigation?

7    A.   He had his driver's license, a fake ID with his name --

8    or, I'm sorry, with his face and another name, two fake IDs

9    of the minor female from the room and each one had a

10   different name on it, as well as a Social Security card with

11   the -- with one of the names that appeared on one of the

12   fake IDs for the minor female, approximately $2500 in cash,

13   and a cellular telephone.

14   Q.   And when you say he had two fake IDs for the minor

15   female, you're referring to N.P.?

16   A.   Yes.

17   Q.   And what about them -- what about those fake identity

18   cards related to N.P. if the names were different?

19   A.   Just the photo -- just the photograph on the -- on the

20   card itself.

21   Q.   Did he -- you mentioned -- did he have a cell phone on

22   him?

23   A.   Yes, he did.

24   Q.   Do you recall what kind of cell phone that is?

25   A.   I believe it was an iPhone.

1  Q.   Based on your training and experience, are iPhones

2  manufactured outside the United States?

3  A.   Yes, they are.

4  Q.   And they move in or affect interstate or foreign

5  commerce?

6  A.   Yes, they do.

7  Q.   Special Agent, what other steps, in addition to the

8  search of the defendant's person, were taken in furtherance

9  of the investigation?

10  A.   Hillsborough County subsequently applied for search

11  warrants of the telephone that was found on the defendant,

12  the Chevy Impala, a room where the defendant and the minor

13  female were staying, and the cellular telephone belonging to

14  the minor female that was turned over when she was detained.

15  Q.   And let's start with the minor female.  Was she

16  interviewed?

17  A.   Yes, she was.

18  Q.   And what did she say to law enforcement?

19  A.   She initially said that an individual was not her

20  trafficker, but dropped her off at the hotel knowing that

21  she was going to commit a commercial sex act.  And when

22  further questioned about who was going to get the money, the

23  minor female stated that she was going to keep most of it

24  and provide the defendant approximately $300.

25  Q.   And did that story change?

```
1    A.    Yes.

2    Q.    Based on your training and experience, is it common for

3    victims of sex trafficking to give initial false stories?

4    A.    Yes, it is.

5    Q.    Okay.  And then, when that story changed, what was the

6    story that the minor victim gave after she changed her

7    story?

8    A.    That he was in fact her trafficker, that they had

9    traveled from Texas to Florida --

10   Q.    Well, let me back you up there.  How did they meet?

11   A.    They met at a -- they met in Texas and he provided her

12   with a strand of marijuana that was very difficult for

13   anybody else to get.

14   Q.    Do you recall where she was working at the time, if at

15   all?

16   A.    I believe it was in a club of some sort.  I'm not

17   entirely certain.

18   Q.    And after they met, what did she report then?

19   A.    That they came to -- they came to Florida via New

20   Jersey, Maryland, North Carolina, and Georgia.  They

21   traveled there separately.  The defendant drove and

22   purchased a Greyhound bus ticket for the minor female from

23   Florida to New Jersey.

24   Q.    And so N.P. traveled by bus from Florida to New Jersey?

25   A.    Yes.
```

1   Q.   And she traveled on a bus ticket that, according to

2   her, the defendant had bought for her?

3   A.   Yes.

4   Q.   And how did the defendant get to Florida -- or to New

5   Jersey, then Florida?

6   A.   He drove the black Chevy Impala.

7   Q.   And what was her understanding of why they traveled

8   separately?

9   A.   According to the minor female, she was told that their

10  ages are so far apart, if they were pulled over that the

11  cops would know it was trafficking.

12  Q.   And did she share how she got to her bus stop in Texas

13  on her way out of Texas?

14  A.   Yes.

15  Q.   And how was that?

16  A.   The defendant drove her to the bus stop, purchased her

17  the ticked, handed her the ticket, and then she boarded the

18  bus.

19  Q.   And you mentioned, Special Agent, that there were

20  search warrants obtained and executed on certain electronic

21  devices.  Was law enforcement able to analyze those devices?

22  A.   Yes.

23  Q.   Were any communications found between N.P. and the

24  defendant?

25  A.   Yes.

1    Q.    What were the nature of those messages?

2    A.    There were 122 text messages from the minor female to

3    the defendant saying N, or starting, which would be

4    indicative of beginning -- that she was beginning to -- she

5    was beginning a commercial sex act.

6    Q.    Why is that indicative?

7    A.    Because the pimps or traffickers want to know when the

8    commercial sex act is starting and when it ends so that they

9    can keep track of how much time the victim is spending with

10   each individual.

11   Q.    Do you recall N.P. also relaying that to law

12   enforcement?

13   A.    Yes.

14   Q.    That that was the way they operated?

15   A.    Yes.

16   Q.    Okay.  And what else was on the cell phones?

17   A.    There were -- of those 122 text messages, there were --

18   I believe the number is 33, it's either 33 or 32 text

19   messages saying that the John was cash apping the defendant

20   the money.  There were also instances not contained in those

21   122 where the minor female was texting the defendant, he

22   just texted you -- or he just cash apped you money.

23   Q.    And what about text messages sent from the defendant to

24   the minor victim's phone, did you recover -- did law

25   enforcement recover any of those?

1    A.    Yes.

2    Q.    How could you -- just generally describe the nature of

3    those messages to the Court?

4    A.    Controlling.

5    Q.    Did any of them -- in any of those messages the

6    defendant identify as a trafficker or pimp?

7    A.    Yes.

8    Q.    And what did he say along those lines?

9    A.    In one of them -- in one of the -- one of the text

10   messages, the minor female texted RR, which is for restroom,

11   she had to use the bathroom, and the defendant responded

12   something to the effect of, bitch, I don't have time for

13   this, I'm getting sick of this shit.  So he was -- the

14   defendant was monitoring when and how often the juvenile was

15   using the bathroom.

16        There were also discussions -- or he also texted her

17   that she needed to start working out, he was going to

18   monitor what she ate and drank and she was not to have any

19   juice or soda for a period of one week.

20   Q.    And these are just some examples, correct, Special

21   Agent, and you've outlined additional messages in your

22   affidavit as part of the claim in this case?

23   A.    Yes.

24   Q.    Special Agent, how did -- did the victim touch at all

25   in her interview about how the money was to be distributed

1    between the defendant and herself?

2    A.    Initially she said that she was only going to get a

3    portion of the money.  She kept the -- I'm sorry.  Initially

4    she stated that she kept the most -- most of the money and

5    that the defendant got a portion of it.  And then later on

6    it was all the money went to the trafficker or to the

7    defendant.

8    Q.    And to be clear, this is money in exchange from patrons

9    for sex with the minor victim, N.P., correct?

10   A.    Correct.

11   Q.    When N.P. was being interviewed, you had mentioned he

12   initially went to New Jersey -- or she initially went to New

13   Jersey?

14   A.    Ye.

15   Q.    Where else did she report going?

16   A.    She went to Maryland, North Carolina, and Georgia.

17   Q.    And according to her, was the defendant involved in

18   those trips as well?

19   A.    Yes.

20   Q.    Was any further investigation done into those

21   additional stops along the way from Texas to Florida?

22   A.    Yes.

23   Q.    And what, if anything, did law enforcement uncover that

24   would corroborate N.P's story?

25   A.    License plate readers detected the license plate of the

1  black Chevy Impala that was found at the time of the

2  defendant's arrest in New Jersey, North Carolina, and

3  Georgia.  Additionally, there were advertisements on

4  MegaPersonals that were posted in New Jersey, Maryland,

5  North Carolina, Georgia, that were similar in nature to the

6  advertisement that was posted in Florida on MegaPersonals.

7  Q.   And I think you had mentioned phone numbers.  Was the

8  phone number on those ads the same as the phone number that

9  had been contacted for the investigation?

10  A.   It was.

11  Q.   Special Agent, to be clear, when N.P. was interviewed,

12  did she comment on whose idea this enterprise was?

13  A.   It was the defendant's.

14        MR. MURRAY:  No further questions, Your Honor.

15        THE COURT:  Thank you.

16        Ms. Burden, any cross-examination?

17        MS. BURDEN:  Just briefly, Your Honor.  First,

18  pursuant to Federal Criminal Procedure 26.2, we would move

19  for the production of any of this witness's statements.

20        THE COURT:  Is there anything, Mr. Murray?

21        MR. MURRAY:  Your Honor, just the complaint

22  affidavit and I informed counsel of that before the hearing.

23        THE COURT:  Okay.  And, Ms. Burden, you have that.

24        MS. BURDEN:  I do.

25        THE COURT:  But your motion is granted and it

1    sounds like it's already been complied with.

2            MS. BURDEN:  Okay.  Just a few question along that

3    line, though.

4                        CROSS-EXAMINATION

5    BY MS. BURDEN:

6    Q.   Special Agent Williger, correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  Just wanted to make sure.  There were search

9    warrant affidavits prepared for the phone taken from N.P.,

10   correct?

11   A.   Yes, ma'am.

12   Q.   For the Chevy Impala, for the hotel room, and then for

13   the phone taken from Mr. -- I was about to say Mr. Williger,

14   excuse me -- Mr. Muldrew, correct?

15   A.   Yes, ma'am.

16   Q.   Okay.  Did you author any of those search warrants?

17   A.   No, ma'am, I did not.

18   Q.   Okay.  Of the other items taken out of any of the

19   rooms, there were some items mentioned in the affidavit that

20   were taken out of the room, as well as the hotel, did you

21   author any search warrants or have search warrants submitted

22   for those items?

23   A.   No, I did not.

24   Q.   Okay.  And then also, as part of your testimony today,

25   were there any electronic communications or emails that

1  served as the basis for some of the testimony that you gave

2  here today?

3  A.   Yes.

4  Q.   Okay.

5         MS. BURDEN:   Your Honor, I would believe that

6  those fall under Jencks as well.

7         THE COURT:   Mr. Murray --

8         You asked for emails?

9         MS. BURDEN:   Any electronic communications or

10  emails that served as the basis for some of this testimony

11  today.

12         MR. MURRAY:   Your Honor, I don't think the witness

13  understood the question.   Perhaps I'd ask the Court or

14  counsel to rephrase it.   I did check with the AUSA and I

15  don't believe that there are any substantive emails that the

16  witness sent that would relate to the -- his testimony here

17  today.   The only two emails that were sent to me was one was

18  the pedigree paragraph that was included in his complaint

19  affidavit, and the other one was, like, a question about

20  bringing the defendant over by way of the Marshals or

21  something in that respect.   So --

22         THE COURT:   Okay.   So the emails that you relied

23  upon, though, for your testimony today?

24         THE WITNESS:   No, ma'am.   I misunderstood.   Just

25  text messages.   There were no emails in the defendant's or

1    the victim's phone.

2              THE COURT:  Okay.  So there's no -- any

3    communications or statements that you've made prior to this

4    case -- or prior to your testimony today?

5              THE WITNESS:  No, ma'am.

6              MS. BURDEN:  Okay.

7              MR. MURRAY:  Your Honor, my understanding of that

8    question was I think the way it was asked was were there any

9    text messages or emails that you relied upon, and I think

10   the witness answered yes, of course, there were, because we

11   searched the phones.

12             MS. BURDEN:  Okay.

13             MR. MURRAY:  But those aren't statements from the

14   witness, Your Honor.

15             THE COURT:  Okay.  And let's just -- let's just

16   clear that up.

17             MS. BURDEN:  I was going to say, I can clarify if

18   necessary.

19             THE COURT:  Go ahead and ask, Ms. Burden.

20   BY MS. BURDEN:

21   Q.   Sorry, I did go from talking about the phones and all

22   of that to asking you that question.  So unrelated to their

23   phones and the information taken off of them, were there any

24   other emails between you and other agents authored -- emails

25   or electronic communications that served as the basis for

1    some of your testimony here today?

2    A.   I want to say no, but I'll have to check.  I don't

3    recall.

4    Q.   Okay.  I don't know how to --

5              THE COURT:  So emails that you authored or other

6    agents authored to you about this case?

7              THE WITNESS:  It would not have been in an email,

8    it would have been in a text message to another agent asking

9    a question.

10             THE COURT:  Okay.

11             THE WITNESS:  Verification.

12             THE COURT:  And do you have your phone with you

13   now?

14             THE WITNESS:  I do.

15             THE COURT:  Let's do that, let's take a short

16   recess so that you can -- and Mr. Murray can look through

17   them with you and see if there's any that need to be screen

18   shot or provided for Ms. Burden to look at.  If there's --

19             MR. MURRAY:  Certainly, Your Honor.

20             THE COURT:  If there's questionable ones,

21   Ms. Burden can just look at them and she will have seen them

22   and we can from there.

23             MS. BURDEN:  That's it.

24             MR. MURRAY:  And, Your Honor, just to be clear,

25   the scope of the Jencks Act is not going to cover statements

1    from other agents unless he -- they're statements from the

2    witness.  So unless he somehow adopted a statement from

3    another agent, if it's an agent sending him information,

4    that's not covered under 18 U.S.C. 3500.

5              THE COURT:  I think the concern is if they're

6    going back and forth and if it's then becoming part of it,

7    right.

8              MR. MURRAY:  Right.  Right.  Yeah, we can do that.

9              MS. BURDEN:  Just to be clear.

10             THE COURT:  Let's just take a very brief recess so

11   he can look through his phone.

12             And, Mr. Murray, you can do it with him and then

13   if Ms. Burden needs to see any of it, she can.

14             We'll take a brief recess.

15             (A brief recess was taken, after which the

16   following proceedings were had in open court.)

17             THE COURT:  Okay.  So during the break, were you

18   able to look through Agent Williger's phone?

19             MS. BURDEN:  Yes.  Thank you, Your Honor.

20             THE COURT:  And are you satisfied that you've been

21   able to see anything that could have --

22             MS. BURDEN:  Yes, and we are ready to proceed,

23   Your Honor.

24             THE COURT:  -- arguably been Jencks material?

25   Okay.

1          MS. BURDEN:  Yes.  Thank you, Your Honor.

2          THE COURT:  Go ahead.

3          MS. BURDEN:  I just have a -- just a couple of

4    brief questions and then we'll be all set.

5    BY MS. BURDEN:

6    Q.   I know you discussed that you were able to look through

7    some of the text messages in the phones.

8    A.   Yes.

9    Q.   I just want to be clear, and I know you all have it in

10   front of you, so I'll read from it.  Page six of your

11   affidavit lists N.P.'s phone number as the phone number with

12   the (908) area code.  And then Mr. Muldrew's phone, there

13   are two numbers that are associated with that phone.  The

14   text message communications that are kind of written out in

15   here, is it confirmed when looking at her phone that they

16   came from either one of the two numbers that are associated

17   with Mr. Muldrew's phone and vice versa?

18   A.   I'm not sure about that.

19   Q.   Okay.  Do you know how it was -- if not that, then do

20   you know how it was determined that these messages in her

21   phone came from Mr. Muldrew?

22   A.   It was in the conversations that they were having.

23   Q.   Okay.

24   A.   And it's -- it was just in the conversations that

25   they -- you could tell that they were talking back and forth

1   to one another.  But I don't -- I'm sorry, I don't recall

2   the telephone numbers that were taken out of the text

3   strings.

4   Q.   Out of the strings, okay.  So when you say you can tell

5   from the content of the conversations, and don't let me

6   mischaracterize your words, but are you saying I'm looking

7   at transferred from two cell phones and putting --

8   A.   Yes, ma'am.

9   Q.   -- the question and answer together?

10  A.   Yes, ma'am.

11  Q.   Okay.

12          MS. BURDEN:  All right.  Thank you, Your Honor.  I

13  don't have any further questions.

14          THE COURT:  Any redirect, Mr. Murray?

15                    REDIRECT EXAMINATION

16  BY MR. MURRAY:

17  Q.   Special Agent, just so we're clear, you weren't the --

18  you're not a forensic analyst, correct?

19  A.   No, I'm not.

20  Q.   Is it your understanding that there were two phone

21  numbers assigned to the phone that law enforcement found on

22  Mr. Muldrew's person?

23  A.   Yes.

24  Q.   And is it your understanding -- and I can refresh your

25  recollection with your affidavit if you would like, but is

1    it your understanding that there was an application

2    installed on that phone called Text Free?

3    A.   Yes.

4    Q.   Okay.  And what is that?

5    A.   It's a -- it's an application that you can download

6    that will -- it's called spoofing a number, where it just

7    generates random telephone numbers for outgoing text

8    messages.

9    Q.   And so to be clear, here today when you've talked about

10   Mr. -- the defendant sending text messages from his phone,

11   you're either referring to one of the two numbers found on

12   his phone through different SIM cards or you're referring to

13   outgoing messages using that application?

14   A.   Yes.

15            MR. MURRAY:  No further questions, Your Honor.

16            THE COURT:  Okay.  Thank you.

17            Special Agent Williger, if you want to take off

18   your microphone and you may step down.

19            MR. MURRAY:  Your Honor, I would just ask that the

20   Court take notice of Document 1, which is the complaint, in

21   terms of any argument.  And I'd also like for the record to

22   reflect that I reviewed the agent's phone and there didn't

23   appear to be anything of substance that would have fallen

24   under the Jencks Act, it was all logistical things.  And

25   there was one slightly substantive thing that he did not

1  testify about.

2        THE COURT:  Okay.  And I don't know that I put on

3  the record earlier, but when Special Agent Williger did

4  identify the defendant, it was -- he was -- or, excuse me,

5  identified who it was that he saw that was in the parking

6  lot, it was Mr. Muldrew, the defendant here.

7        Okay.  And you may step down.

8        Is there anybody else that you plan to call?

9        MR. MURRAY:  No, Your Honor, just -- or --

10        THE COURT:  Would you like to make any argument as

11  to probable cause?

12        MR. MURRAY:  No, Your Honor, we would rest on the

13  affidavit that's submitted in support of the criminal

14  complaint.

15        THE COURT:  Thank you.

16        And go ahead, Ms. Burden, any argument you would

17  like to make?

18        MS. BURDEN:  Your Honor, I agree as to the -- or I

19  agree that there's probable cause based on the affidavit and

20  Special Agent Williger's testimony here.

21        THE COURT:  Okay.  Thank you.  And I do -- even if

22  you had not agreed, I do find that there's probable cause

23  for all three of the offense descriptions listed on the

24  front of the criminal complaint.

25        In terms of bail and considering that issue, what

1    is the government's position on the release or detention of

2    Mr. Muldrew?

3              MR. MURRAY:  Your Honor, we are requesting

4    detention under 3142(f).  We would invoke the presumption

5    under 3142(e), and we would like to be heard as to our

6    arguments in that regard.

7              THE COURT:  Okay.  Let me just ask you,

8    Ms. Burden, do you plan to contest detention or are you

9    reserving at this time?

10             MS. BURDEN:  After speaking to Mr. Muldrew again,

11   Your Honor, at this time we're going to reserve as to the

12   issue of bond.

13             THE COURT:  Okay.  So what I will just -- in terms

14   of the argument to be made for detention, I've heard plenty

15   now based on what was testified to by Special Agent

16   Williger, so I don't need to hear any more of a proffer from

17   you, Mr. Murray.

18             And because you are reserving on the matter of

19   bond, Mr. Muldrew, if the circumstances do later warrant it,

20   you are able to come back by way of a motion at that time

21   and I can address whether you should continue to be detained

22   or whether you should be released at that time.

23             Anything else that we need to do for this case

24   today, then, from the government's perspective?

25             MR. MURRAY:  No, Your Honor.

1          THE COURT:  Anything, Ms. Burden, from the

2    defense's perspective?

3          MS. BURDEN:  No, Your Honor.  Thank you.

4          THE COURT:  Then we are in recess -- oh, actually,

5    I have one more thing.

6          As required by Rule 5(f), the United States is

7    ordered to produce all exculpatory evidence to the defense

8    pursuant to *Brady vs. Maryland* and its progeny.  Failing to

9    do so in a timely manner may result in sanctions, including

10   exclusion of evidence, adverse jury instructions, dismissal

11   of charges, and contempt proceedings.  So -- and we are

12   going to have to do a much better job of saying that much

13   more succinctly, because otherwise we are going to be sick

14   of saying it after a while.

15          Thank you.  We are in recess.

16               (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

35

```
 1   UNITED STATES DISTRICT COURT )
                                  )
 2   MIDDLE DISTRICT OF FLORIDA   )

 3                   REPORTER TRANSCRIPT CERTIFICATE

 4
          I, Howard W. Jones, Official Court Reporter for the
 5   United States District Court, Middle District of Florida,
     certify, pursuant to Section 753, Title 28, United States
 6   Code, that the foregoing is a true and correct transcription
     of the stenographic notes taken by the undersigned in the
 7   above-entitled matter (Pages 1 through 34 inclusive) and
     that the transcript page format is in conformance with the
 8   regulations of the Judicial Conference of the United States
     of America.

 9

10                               /s     Howard W. Jones
                                 _____
11                               Howard W. Jones, RPR, FCRR
                                 Official Court Reporter
12                               United States District Court
                                 Middle District of Florida
13                               Tampa Division
                                 Date:  06-07-21
14

15

16

17

18

19

20

21

22

23

24

25
```